UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOYCE MAHOSKI-CIARLA,          :
                               :CIVIL ACTION NO. 3:17-CV-425
         Plaintiff,            :
                               :(JUDGE CONABOY)
         v.                    :
                               :
NANCY A. BERRYHILL,            :
Acting Commissioner of         :
Social Security,               :
                               :
         Defendant.            :
                               :
_____

**MEMORANDUM**

Pending before the Court is Plaintiff's appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI. (Doc. 1.) Plaintiff filed applications for benefits on December 31, 2013, alleging a disability onset date of March 19, 2013. (R. 21.) After she appealed the initial denial of the claims, a hearing was held on July 24, 2015, and Administrative Law Judge ("ALJ") Jarrod Tranguch issued his Decision on December 21, 2015, concluding that Plaintiff had not been under a disability during the relevant time period. (R. 21, 32.) Plaintiff requested review of the ALJ's decision which the Appeals Council denied on January 4, 2017. (R. 1-6, 16-17.) In doing so, the ALJ's decision became the decision of the Acting Commissioner. (R. 1.)

Plaintiff filed this action on March 7, 2017. (Doc. 1.) She asserts in her supporting brief that the Acting Commissioner's

determination is error for the following reasons: 1) his determination that Plaintiff's knee arthritis and anxiety were not severe impairments was error; and 2) he erred in rejecting the opinions of Plaintiff's treating psychiatrist, Dr. Matthew Berger. (Doc. 14 at 3.)  After careful review of the record and the parties' filings, the Court concludes this appeal is properly granted.

## I. Background

Plaintiff was born on April 13, 1961, and was fifty-two years old on the alleged disability onset date.  (R. 31.)  She has a high school education and past relevant work as a food service supervisor, food service coordinator, and telemarketer. (*Id.*) Plaintiff alleges she is unable to work on a competitive full-time basis due to right knee arthritis, bipolar disorder, and anxiety disorder with panic attacks.  (Doc. 14 at 2.)

### *A. Medical Evidence*

### 1. **Primary Care**

*a. Right Knee Arthritis*

At a primary care visit on September 30, 2013, Plaintiff complained of right knee pain and stiffness.  (R. 373.)  At the request of her primary care provider, Leocadia T. Prawdzik, M.D., Plaintiff had x-rays indicated by right knee pain at Hazleton General Hospital on October 11, 2013.  (R. 315.)  The "Impression" was no acute fracture or dislocation, mild degenerative joint

2

changes, and small joint effusion.  (*Id.*)

On October 14, 2013, upon Plaintiff's request, Dr. Prawdzik referred Plaintiff for an orthopedic consultation because she reported in a telephone contact that nothing was helping her right knee pain.  (R. 372.)  Plaintiff reported that her pain was getting worse at her October 16th office visit.  (R. 371.)  Examination showed that she had pain in the posterior and medial aspects of the right knee with mild swelling, gait dysfunction, and mild right leg swelling.  (*Id.*)

Plaintiff saw James E. Murphy, M.D., for an orthopedic consultation on October 22, 2013.  (R. 387.)  Dr. Murphy informed Dr. Prawdzik that Plaintiff reported a four-week history of right knee pain that "started out of the blue" and bothered her when she was walking on flat ground and bending her knee to go up steps. (*Id.*)  Dr. Murphy found that x-rays did not show any significant abnormalities but he thought they showed some mild osteoarthritis. (*Id.*)  He also found that Plaintiff's clinical  examination was consistent with "pes tendinitis as she is quite tender right over the spot of the tendon insertion."  (*Id.*)  Dr. Murphy recommended avoidance of aggravating activities, nonsteroidal antiinflammatories, and physical therapy for evaluation.  (*Id.*)  He noted that she would follow up with him on an as-needed basis. (*Id.*)

On January 8, 2014, Plaintiff reported that naproxin was

helping her right knee pain.  (R. 368, 473.)

On May 15, 2015, Plaintiff reported that she had knee pain and the right knee was giving out three times per week.  (R. 471.)  She said it was worse when walking and she had increased pain when doing steps and standing up from a sitting position.  (*Id.*)

On June 10, 2015, Dr. Prawdzik noted that Plaintiff had no complaints, and musculoskeletal pain and stiffness were much better with Naproxen.  (R. 469.)  His diagnoses included degenerative joint disease of the right knee.  (*Id.*)

b.    *Anxiety and Depression*

On December 17, 2012, Dr. Prawdzik's diagnoses included anxiety and depression.  (R. 378.)  In August 2013 Dr. Prawdzik did not make any notation in the ROS "Psych" section and examination findings included that Plaintiff's mental status was within normal limits.  (R. 374-75.)  He continued to include anxiety and depression in his diagnoses.  (R. 375.)  In September, Plaintiff continued to report a lot of anxiety.  (R. 373.)

On January 8, 2014, Plaintiff told Dr. Prawdzik she was experiencing increased anxiety which included palpitations and shortness of breath during anxiety attacks.  (R. 368, 473.)  On May 15, 2015, Plaintiff reported increased anxiety and said she was seeing a therapist and psychiatrist.  (R. 471.)  Dr. Prawdzik noted that Plaintiff had no complaints in June 2015 but his diagnoses included anxiety and depression.  (R. 469.)

4

## 2.  **Mental Health Treatment**

Plaintiff's treating psychiatrist has been Matthew Berger, M.D., who began treating her in February 2013 upon referral from her primary care provider.  (R. 420.)  At the initial visit, Dr. Berger recorded that Plaintiff reported symptoms of bipolar disorder, eating disorder, and substance abuse.  (*Id.*) Objectively, Dr. Berger assessed Plaintiff's mood as anxious and depressed with an affect appropriate to that mood.  (R. 422.) Otherwise no problems were noted with Plaintiff's psychiatric examination.  (*Id.*)  Dr. Berger diagnosed Alcohol Abuse in Remission, Bipolar I Disorder Current Mixed NOS, Eating Disorder Other.  (*Id.*)  He assessed a current GAF score of 49.  (*Id.*) Dr. Berger adjusted Plaintiff's medication regimen and scheduled Plaintiff to see a therapist.  (R. 423.)

In June 2013, Plaintiff reported that she was doing well and that seeing the therapist had been very helpful.  (R. 416.) Plaintiff continued to report symptoms of bipolar disorder and said she was taking her medications as prescribed but felt worse compared to her previous visit.  (*Id.*)  She also reported symptoms of eating disorder and substance abuse including binge eating, body dysmorphia, self-induced vomiting, infrequent diuretic use, and recent alcohol consumption.  (*Id.*)  Dr. Berger noted that Plaintiff displayed depression during the encounter and otherwise her psychiatric examination was unremarkable.  (R. 418.)  Dr. Berger

noted that Plaintiff's bipolar illness and eating disorder were ongoing, and her substance abuse was episodic. (R. 418.) His diagnosis remained the same and his GAF score was assessed to be 50. (*Id.*)

Dr. Berger's assessments in July, August, and October indicate that Plaintiff's bipolar disorder and eating disorder were improving or stable, and her alcohol abuse was episodic or in remission. (R. 402, 406, 410, 414.) GAF scores of 54-56 were recorded. (*Id.*) He also noted that Plaintiff had been taking her medication as prescribed. (R. 400, 404, 408, 412.)

In January 2014, Plaintiff reported a lot of daytime anxiety and rated her mood as 2/10. (R. 396.) She also reported an increase in many bipolar disorder symptoms and said she felt worse compared to her previous visit. (*Id.*) She said she had not taken all prescribed medications for a one-month period due to insurance problems. (*Id.*) Plaintiff continued to report symptoms of eating disorder and said she had used alcohol in October. (*Id.*) Dr. Berger found Plaintiff's affect to be depressed and labile but her psychiatric examination was otherwise normal. (R. 398.) He concluded Plaintiff's bipolar illness was increasing, her eating disorder was stable, and her alcohol abuse was in remission. (R. 398.) He assessed a GAF score of 50.[1] (*Id.*)

_____

[1] From January 2014 through June 2015, the provider recorded that Plaintiff reported she was not taking her prescribed medications. (*See*, *e.g.*, R. 396, 483.) Discussion of

In February 2014, Plaintiff reported to Dr. Berger that she was "terrible" and her mood had been like a "roller coaster." (R. 392.) She reported increased bipolar disorder symptoms, some improvement with eating disorder symptoms, and no new episodes of alcohol use. (*Id.*) Dr. Berger found Plaintiff to be anxious with an affect appropriate to her mood. (R. 394.) He noted that Plaintiff's speech was overproductive and tearful and her judgment and insight were fair. (*Id.*) Dr. Berger again assessed Plaintiff's bipolar illness to be increasing, her eating disorder to be stable, her alcohol abuse was in remission, and her GAF score was 44. (*Id.*)

In March 2014, Plaintiff reported to Teresa Clark, CRNP, that she was "a little better," and she felt that her medication adjustment had helped. (R. 434.) She continued to report symptoms of bipolar disorder and eating disorder. (*Id.*) Ms. Clark noted that Plaintiff's speech was overproductive and tearful, and her judgment and insight were fair. (R. 436.) She assessed that Plaintiff's bipolar disorder was increasing, her eating disorder was stable, and her alcohol abuse was in remission. (*Id.*) She recorded a GAF score of 44.

---

noncompliance is not found in these records. Rather, the provider sometimes noted an alteration in the medication regimen (*see*, *e.g.*, R. 399, 395, 486), noted that current medications were to be continued with a caveat regarding alcohol use (*see*, *e.g.*, R. 441, 445), or that the medications were to be continued because Plaintiff was doing well (*see*, *e.g.*, R. 457, 460).

On June 4, 2014, Plaintiff reported to Ms. Clark that she had started drinking again and she been under increased stress due to financial concerns and pressure to take a job managing a small bakery that she knew would be too much for her. (R. 438.) She expressed experiencing symptoms related to bipolar disorder and eating disorder. (*Id.*) Ms. Clark noted that Plaintiff's mood was subdued with related affect. (R. 440.) She also noted that Plaintiff's speech was overproductive and tearful, her judgment was impulsive, and her insight was lacking. (*Id.*) She assessed that Plaintiff's bipolar illness was ongoing, her eating disorder was stable, and her alcohol abuse was episodic. (*Id.*) Ms. Clark again recorded a GAF score of 44. (*Id.*)

On June 30, 2014, Plaintiff told Ms. Clark that she had decided not to take the job and she was feeling less overwhelmed since making the decision. (R. 442.) Plaintiff continued to report symptoms of bipolar disorder, eating disorder, and alcohol abuse. (*Id.*) Plaintiff's examination and assessments were the same as earlier in the month except that she was not tearful. (R. 440, 444.)

In October 2014, Plaintiff reported to Ms. Clark that she had taken a part-time job and she was doing craft shows with baked goods which was keeping her busy. (R. 446.) She continued to report symptoms of bipolar disorder with a decrease in some symptoms, and she reported a decrease in eating disorder symptoms.

(*Id.*)  Ms. Clark again found Plaintiff's mood subdued with her affect appropriate to her mood.  (R. 448.)  She assessed ongoing bipolar illness, stable eating disorder, episodic alcohol abuse, and a GAF score of 48.  (*Id.*)

In February 2015, Plaintiff reported an improvement in her mood and Ms. Clark noted that Plaintiff's affect was appropriate to her mood.  (R. 452.)  Ms. Clark continued to find that Plaintiff's judgment was impulsive and her insight was lacking.  (*Id.*)  She assessed that Plaintiff's bipolar illness was improving, her eating disorder was stable, her alcohol abuse was episodic, and her GAF score was 50.  (*Id.*)

Plaintiff again reported improvement to Ms. Clark in April 2015, stating that she knew she took on too much at times and was trying to keep things in perspective.  (R. 454.)  She also reported that she was busy baking for weekend craft shows, and she was working six to nine hours a week which helped with the bills. (*Id.*)  Plaintiff continued to express that she had symptoms of bipolar disorder but stated they had decreased, as had her symptoms of eating disorder.  (*Id.*)  Ms. Clark recorded that Plaintiff's mood was euthymic and her affect was appropriate but her judgment continued to be impulsive and her insight was lacking.  (R. 456.) She assessed that Plaintiff's bipolar illness was improving, her eating disorder was stable, her alcohol abuse was episodic, and her GAF score was 54.  (*Id.*)

In May 2015, Plaintiff reported to Dr. Berger that she was doing well but she was still filled with anxiety. (R. 458.) Plaintiff said that many of her bipolar symptoms had decreased but her ability to concentrate fluctuated, she reported crying, and her energy level was fair. (*Id.*) Dr. Berger found Plaintiff's mood to be euthymic although he assessed her judgment impulsive and her insight lacking. (R. 459.) He assessed that Plaintiff's bipolar illness was improving, her eating disorder was stable, her alcohol abuse was episodic, and her GAF score was 54. (*Id.*)

Plaintiff reported feeling better on June 12, 2015, but said again that she was filled with anxiety. (R. 479.) Dr. Berger's examination was the same as the previous month as was his assessment. (R. 480-81.)

On June 22, 2015, Plaintiff told Ms. Clark she was very anxious and recent medication adjustments had not helped. (R. 483.) Plaintiff discussed her increased anxiety and explained that she had been having panic attacks, "mostly at work." (*Id.*) She said she had been working two days a week but the previous week she had to work four days, adding that "it was awful" and she was "a nervous wreck the whole time." (*Id.*) Plaintiff continued to report symptoms of bipolar disorder though many symptoms had decreased. (*Id.*) Her eating disorder symptoms had also decreased. (*Id.*) Ms. Clark noted that Plaintiff displayed anxiety periodically and a euthymic mood with an affect appropriate to her

mood.  (R. 485.)  She continued to find Plaintiff's judgment impulsive and her insight lacking.  (R. 485.)  Ms. Clark assessed that the bipolar disorder was improving, the eating disorder was stable, the alcohol abuse episodic, and her GAF score was 54. (*Id.*)  Ms. Clark adjusted Plaintiff's medication regimen.  (R. 486.)

On June 22, 2015, Donna O'Donnell, MA, LPC, found that Plaintiff displayed anxiety consistently during the encounter.  (R. 487.)  Her examination was otherwise normal.  (*Id.*)  At the end of July, Ms. O'Donnell recorded that Plaintiff said she had a difficult two weeks which she associated with working more to fill in for employees on vacation.  (R. 494.)  Plaintiff said she had an increase in panic attacks but did not leave work, adding that she felt she did better with four-hour shifts.  (*Id.*)  Ms. O'Donnell found that Plaintiff again consistently displayed anxiety and she assessed ongoing bipolar disorder.  (R. 494.)  Plaintiff saw Ms. Clark on the same day and made basically the same report.  (R. 490.)

On October 26, 2015, Plaintiff reported to Ms. Clark that she had been using alcohol during the preceding week and she thought the relapse was related to the stress of working eight-hour days and a four-day bake show which where too much for her.  (R. 496.) Plaintiff said she felt worse compared to her last visit.  (*Id.*) Ms. Clark found her mood and affect to be subdued, her judgment to

11

be impulsive, and her insight to be fair. (R. 498.) Her assessment was the same as that recorded in July. (*Id.*) Ms. Clark noted that a letter would be provided stating that Plaintiff may not work any longer than four hours or more than three days per week. (R. 499.)

On December 28, 2015, Plaintiff reported to Ms. Clark that her mood was stable and she felt her medications were effective. (R. 500.) Ms. Clark assessed that Plaintiff's bipolar illness and eating disorder were stable, and her alcohol abuse was episodic and in remission. (R. 502.) Ms. Clark noted that she discussed the stress of working and finances and the impact on mood and function, reviewed strategies to help with anxiety, and again said that a letter would be provided indicating that Plaintiff should work no longer than four-hour shifts. (R. 503.) Ms. Clark added that Plaintiff was aware that her employer may terminate her due to the restrictions. (*Id.*)

## B.  *Opinion Evidence*

## 1.  **Treating Psychiatrist**

The record shows that the work restrictions noted above were memorialized in a letter dated October 26, 2015. (R. 478.) Dr. Berger indicated that Plaintiff was "to work no more than three four hour days a week due to her medical condition." (*Id.*)

On June 5, 2015, Dr. Berger completed a Medical Opinion Re: Ability to Do Work-Related Activities (Mental). (R. 462.) The

introductory instructions state that the provider is to determine the "patient's ability to *do work-related activities on a day-to-day basis in a regular work setting*." (R. 462.) Dr. Berger opined that Plaintiff had marked or extreme limitations in all mental abilities and aptitudes needed to do unskilled work. (*Id.*) He noted that these limitations were based on the following: "Severe mood swings & anxiety affect pts. ability to consistently maintain work schedule and interact with others." (*Id.*) For similar reasons, Dr. Berger found that Plaintiff had marked or extreme limitations in all mental abilities and aptitudes needed to do semiskilled and skilled work. (R. 463.) Regarding Plaintiff's mental abilities and aptitudes needed to do particular types of jobs, he rated Plaintiff's ability to adhere to basic standards of neatness and cleanliness as "None/Mild"; he concluded Plaintiff had moderate limitations in her abilities to interact appropriately with the general public and maintain socially appropriate behavior; and he assessed marked limitations in her ability to travel in unfamiliar places and use public transportation. (*Id.*) The marked limitations were based on Plaintiff's anxiety. (*Id.*) Dr. Berger also opined that Plaintiff would miss work about three times a month due to her impairments. (*Id.*) Finally, he noted that the opinions expressed were based on clinical observations and psychiatric evaluation. (*Id.*)

## 2. **Disability Determination Services Consultant**

John Rohar, Ph.D., a non-examining consultant, completed Psychiatric Review Technique Forms and Mental Residual Functional Capacity Assessments on April 1, 2014. (R. 126-30, 136-40.) He found that Plaintiff had medically determinable impairments: Affective Disorders - severe; Anxiety Disorders - non severe; Alcohol, Substance Addiction Disorders - non severe; and Personality Disorders - non severe. (R. 126, 136.) He concluded that Plaintiff had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (R. 126-27, 137.) In the Title II DIB determination, Dr. Rohar found Plaintiff had one or two repeated episodes of decompensation, each of extended duration. (R. 127.) In the Title XVI DI determination, he found that had no repeated episodes of decompensation, each of extended duration. (R. 137.)

In his RFC assessments, Dr. Rohar found that Plaintiff had moderate limitations in many areas and determined that she could "perform simple, routine repetitive work in a stable environment." (R. 128, 138.) He found Plaintiff had moderate limitations in the following abilities: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; make simple

14

work-related decisions; work a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and travel in unfamiliar places or use public transportation. (R. 128-30, 138-30.)

## C.     *Hearing Testimony*

Plaintiff testified at the July 24, 2015, hearing that she began working at Weis Markets in July 2014 and she worked six to eight hours a week (three or four-hour days) in the produce department setting up the salad bar. (R. 73.) She also said that she made baked goods to sell at craft shows about once a month, explaining that she used to do two days in a row but her doctors thought that was too much so she just did one day for four or five hours. (R. 73, 75.)

When asked by ALJ Tranguch what kept her from working more, Plaintiff responded that she got severe anxiety and panic attacks and she can't go for a long period of time in a work environment. (R. 84.) She said that she once had to leave work, she called in and didn't go to work, and she has gotten very dizzy and had to go to the break room. (*Id.*) Plaintiff explained her anxiety and

15

panic attack experiences, stating that she had anxiety every day and she had an anxiety/panic attack from one to five days a week lasting from half an hour to two hours. (R. 85, 104-05.) She also said that her anxiety caused problems with concentration. (R. 97.) She noted that drinking was her crutch, her way of self-medicating and, even though she feels better not drinking, she still has anxiety, depression, and panic attacks. (R. 100-01.)

When ALJ Tranguch asked if she had been hospitalized in the preceding two years because of an anxiety attack or panic attack, Plaintiff said that she had been. (R. 87.) Though she was not certain of the dates, she explained that she was at the Hazleton General Hospital emergency room one time and another time she had a panic attack at a craft show which led to a seizure and paramedics took her to Wilkes-Barre General Hospital or Geisinger and she was hospitalized. (R. 87-88.) The ALJ identified some records from November 2011 so it was determined the hospitalization was outside the relevant time. (R. 89-90.)

The ALJ inquired about knee pain, and Plaintiff said she was taking Naproxen for the pain and her attorney clarified that records related to the knee problem date back to September 2013. (R. 91-93.) Plaintiff said the medication helped but she still got pain in her knee. (R. 96.) She also testified that she had a brace which she did not wear and she could stand for three or four hours before she needed to sit down. (*Id.*)

Following the Vocational Expert testimony, Plaintiff's attorney noted that counseling records had not been released. (R. 117.) She added "they don't release them to us" and ALJ Tranguch commented that he did not know whether the attorney would be able to get them, adding "I find oftentimes counseling records are handwritten and difficult to read. I mean if you want to get them in, it's up to you. I'm not going to --. . . . I don't need them. . . . If you want to submit them before I get my decision out, you're welcome to do that." (R. 118.)

**4.** **ALJ Decision**

With his December 21, 2015, Decision, ALJ Tranguch determined that Plaintiff had the severe impairments of bipolar disorder and alcohol abuse which did not meet or equal a listed impairment. (R. 23-26.) He also found that Plaintiff had several non-severe impairments, including knee pain (diagnosis of degenerative joint disease of the right knee), which did not cause functional limitations of the required duration. (R. 24.)

The ALJ concluded that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all levels with the following non-exertional limitations:

> The claimant is limited to work that is unskilled or semi-skilled in nature. She can perform occupations that are considered low stress involving occasional simple decision making and requiring only occasional changes in work duties or work setting. The claimant can have occasional contact with customers and members of the public.

17

(R. 26-27.)  In explaining his RFC, ALJ Tranguch gave limited
weight to Dr. Berger's opinion of marked and extreme limitations
and his opinion that Plaintiff could only work part-time because he
found that the opinions were "not supported by the evidence when
considered in its entirety (Exhibits B9F & B12F)."  (R. 30.)  He
gave great weight to the opinions of Dr. Rohar, noting that "aside
from the fact that there is no evidence of repeated episodes of
decompensation of extended duration (Exhibits B3A & B4A)," he
agreed that Plaintiff could perform simple, routine and repetitive
work in a stable environment.  (R. 30.)

With this RFC, ALJ Tranguch concluded that Plaintiff was
unable to perform past relevant work but jobs existed in
significant numbers in the national economy that she could perform.
(R. 31.)  He therefore found that Plaintiff had not been under a
disability as defined in the Social Security Act, from October 25,
2013, through the date of the decision.  (R. 32.)

Other relevant portions of the ALJ's Decision will be
referenced in the Discussion section of this Memorandum.

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to
determine whether a claimant is disabled.[2]  It is necessary for the

---

[2]  "Disability" is defined as the "inability to engage in any
substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected to
result in death or which has lasted or can be expected to last for
a continuous period of not less than 12 months . . . ."  42 U.S.C.

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e).  The residual functional capacity assessment is then used at the

---

§ 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that Plaintiff could perform jobs that existed in significant numbers in the national economy.  (R. 31.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

This oft-cited language is not . . . a

20

> talismanic or self-executing formula for
> adjudication; rather, our decisions make
> clear that determination of the existence *vel
> non* of substantial evidence is *not* merely a
> quantitative exercise.  A single piece of
> evidence will not satisfy the substantiality
> test if the Secretary ignores, or fails to
> resolve, a conflict created by countervailing
> evidence.  Nor is evidence substantial if it
> is overwhelmed by other evidence--
> particularly certain types of evidence (e.g.,
> that offered by treating physicians)--or if
> it really constitutes not evidence but mere
> conclusion.  *See* [*Cotter*, 642 F.2d] at 706
> ("'Substantial evidence' can only be
> considered as supporting evidence in
> relationship to all the other evidence in the
> record.") (footnote omitted).  The search for
> substantial evidence is thus a qualitative
> exercise without which our review of social
> security disability cases ceases to be merely
> deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the ALJ to

analyze all probative evidence and set out the reasons for his

decision.  *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d

Cir. 2000) (citations omitted).  If he has not done so and has not

sufficiently explained the weight given to all probative exhibits,

"to say that [the] decision is supported by substantial evidence

approaches an abdication of the court's duty to scrutinize the

record as a whole to determine whether the conclusions reached are

rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir.

1979).  In *Cotter*, the Circuit Court clarified that the ALJ must

not only state the evidence considered which supports the result

21

but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where a claimed error would not affect the outcome of a case, remand is not required. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005). Finally, an ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or

her decision.  *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

<h1 style="text-align:center">IV. Discussion</h1>

Plaintiff asserts that the Acting Commissioner's determination is error for the following reasons:  1) his determination that Plaintiff's knee arthritis and anxiety were not severe impairments was error; and 2) he erred in rejecting the opinions of Plaintiff's treating psychiatrist, Dr. Matthew Berger.  (Doc. 14 at 3.)

**A.    *Step Two Error***

**1.    Knee Impairment**

Plaintiff first asserts the ALJ erred in concluding that her knee arthritis was not a severe impairment.  (Doc. 14 at 7.) Defendant responds that the ALJ appropriately found the impairment was not severe and his statement that there was no specific diagnosis or cause of Plaintiff's pain was harmless as a diagnosis is not enough and a plaintiff must present evidence that any resulting limitation significantly affected her ability to do basic work activities.  (Doc. 15 at 13-14, 17.)  Plaintiff refutes Defendant's arguments on several bases, including the fundamental principle that some evidence cited by Defendant in support of the decision cannot be considered because this Court can only review the Decision based on the ALJ's rationale and findings.  (Doc. 18 at 3 (citing *Fargnoli v. Massanari*, 247 F.3d 34, 44 n.7 (3d Cir. 2001); *Sykes v. Apfel*, 228 F.3d 259, 271 (3d Cir. 2000); *SEC v. Chenery*, 318 U.S. 80, 87 (1943)).)   The Court concludes the ALJ

did not properly assess Plaintiff's knee problems and the error was not harmless.

The regulations provide that an impairment will be deemed a medically determinable physical or mental impairment when it results "from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. Therefore, a physical or mental impairment must be established by objective medical evidence from an acceptable medical source." 20 C.F.R. §§ 404.1521, 416.921. The regulations further provide that a claimant's "statement of symptoms, a diagnosis, or a medical opinion" will not be used to establish the existence of an impairment. *Id.* Once a medically determinable impairment is found, the determination is made whether it is severe. *Id.* An impairment or combination of impairments is not severe "if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1522, 416.922.

ALJ Tranguch found that Plaintiff's right knee pain did not cause any functional limitations. (R. 24.) He cites evidence that Plaintiff reported Naproxen helped her pain in January 2014, her right knee was giving out on her three times per week in May 2015, her pain and stiffness were much better on Naproxen in June 2015, she was diagnosed with degenerative joint disease of the right knee, x-rays showed mild degenerative joint changes and small joint

24

effusions, and ultrasound did not show deep venous thrombosis from the right common femoral to the popliteal vein. (R. 24 (citations omitted).) The ALJ then concluded there was no indication of specific diagnosis or etiology of pain and no follow-up and there were no related functional limitations lasting twelve months. (*Id.*) Following these conclusions the ALJ noted Plaintiff testified that she could stand for three to four hours at a time. (*Id.*)

First, The Court agrees with Plaintiff that review of this issue encompasses only the rationale and findings found in ALJ Tranguch's Decision. ALJ Tranguch somewhat acknowledged the longevity of complaints established in the record when he cited x-rays showing mild degenerative joint changes and small joint effusions and the diagnosis of degenerative joint disease of the right knee (*see* R. 24) in that the studies were done in October 2013 (R. 315) and the diagnosis is found in Dr. Prawdzik's June 2015 office notes (R. 469). As set out above, Plaintiff first complained of knee pain in September 2013 (R. 315) and continued to complain of knee problems, albeit sporadically, through May 2015 when she specifically reported knee pain and that her right knee was giving out three times a week (R. 471). Throughout this period, degenerative/arthritic changes were noted. (*See*, *e.g.*, R. 315, 387, 469.) Although complaints of knee pain and a supporting diagnosis do not equal the required functional limitations, the ALJ

appears to have rejected Plaintiff's testimony regarding related standing limitations but did so without explanation. (*See* R. 24.) Because ALJ Tranguch's discussion of Plaintiff's knee impairment is significantly flawed, the Court cannot find that his conclusion that the knee impairment was not severe is supported by substantial evidence.

If the sequential evaluation process continues beyond step two, a finding of "not severe" regarding a specific impairment at step two may be deemed harmless if the functional limitations associated with the impairment are accounted for in the RFC. *Salles v. Commissioner of Social Security*, 229 F. App'x 140, 145 n.2 (3d Cir. 2007) (not precedential) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005)). In other words, because the outcome of a case depends on the demonstration of functional limitations rather than a diagnosis, where an ALJ identifies at least one severe impairment and ultimately properly characterizes a claimant's symptoms and functional limitations, the failure to identify a condition as severe is deemed harmless error. *Garcia v. Commissioner of Social Security*, 587 F. App'x 367, 370 (9th Cir. 2014) (citing *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007)); *Walker v. Barnhart*, 172 F. App'x 423, 426 (3d Cir. 2006) (not precedential) ("Mere presence of a disease or impairment is not enough[;] a claimant must show that his disease or impairment caused functional limitations that precluded him from engaging in

26

any substantial gainful activity."); *Burnside v. Colvin*, Civ. A. No. 3:13-CV-2554, 2015 WL 268791, at *13 (M.D. Pa. Jan. 21, 2015); *Lambert v. Astrue*, Civ. A. No. 08-657, 2009 WL 425603, at *13 (W.D. Pa. Feb. 19, 2009).

Here the sequential evaluation process continued, but the functional limitations related to Plaintiff's knee impairment were not accounted for in the RFC. Importantly, because the ALJ found no related functional limitations at step two (R. 24), he did not discuss limitations asserted by Plaintiff related to her knee impairment in assessing her RFC. (*See* R. 26-30.) As noted above, no discussion followed the ALJ's acknowledgment of Plaintiff's testimony about related standing limitations, so the Court can neither say that the functional limitations were properly discounted nor that his RFC excluding such limitations is supported by substantial evidence. Therefore, in this case, the Court cannot conclude that the ALJ's alleged step two error is harmless.

2.  **Anxiety Disorder**

Plaintiff next asserts that the ALJ erred in finding that her anxiety disorder was not severe. (Doc. 14 at 9.) Defendant responds that Plaintiff's records do not show she was diagnosed with anxiety disorder or panic attacks, Dr. Rohar opined that Plaintiff's anxiety disorder was a non-severe impairment, and the ALJ considered Plaintiff's reports of anxiety when he evaluated the mental health record as a whole. (Doc. 15 at 18.) Plaintiff

replies that symptoms rather than diagnosis are important and Dr. Berger acknowledged Plaintiff's anxiety and panic attacks, the ALJ did not rely on Dr. Rohar's finding, and his reference to panic attacks is insufficient. (Doc. 18 at 4-5.) The Court concludes Plaintiff has not shown that the alleged error is cause for remand.

The Court's conclusion is based on the fact that, assuming *arguendo* that the ALJ erred at step two, he acknowledged Plaintiff's ongoing complaints of anxiety and Dr. Berger's anxiety findings in his RFC discussion. (*See* R. 28, 29.) The sufficiency of the related findings will be discussed below in the Court's review of Plaintiff's claimed error regarding Dr. Berger's opinion.

## B.    *Treating Physician Opinion Error*

Plaintiff maintains that ALJ Tranguch erroneously rejected the opinion of Plaintiff's treating psychiatrist, Dr. Berger. (Doc. 14 at 13.) Defendant responds that the ALJ did not err on the basis alleged. (Doc. 15 at 18.) Plaintiff replies that the ALJ's rationale for his determination cannot be discerned from his RFC discussion. (Doc. 18 at 6.) The Court concludes that this claimed error is cause for remand.

Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight. *See*, *e.g.*, *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d

28

Cir. 1981)). Sometimes called the "treating physician rule," the principle is codified at 20 C.F.R. 404.1527(c)(2), and is widely accepted in the Third Circuit. *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986). The regulation addresses the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).[3] "A cardinal principle

---

[3] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3)

guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted); *see also Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008).  In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion."  *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

Pursuant to 20 C.F.R. § 404.1527(c)(2), an ALJ must assign controlling weight to a well-supported treating medical source opinion unless the ALJ identifies substantial inconsistent evidence.  SSR 96-2p explains terms used in 20 C.F.R. § 404.1527 regarding when treating source opinions are entitled to controlling weight.  1996 WL 374188, at *1.  For an opinion to be "well-

through (c)(6) of this section in determining
the weight to give the opinion. We will always
give good reasons in our notice of
determination or decision for the weight we
give your treating source's opinion.

supported by medically acceptable clinical and laboratory diagnostic techniques," 28 U.S.C. § 404.1527(c)(2), "it is not necessary that the opinion be fully supported by such evidence"--it is a fact-sensitive case-by-case determination.  SSR 96-2p, at *2. It is a determination the adjudicator must make "and requires an understanding of the clinical signs and laboratory findings in the case record and what they signify."  *Id.*

As set out above, it is the ALJ's duty not only to state the evidence considered which supports the result but also to indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper."  *Cotter*, 642 F.2d at 706-07.  A thorough explanation of the evidence relied upon by the ALJ in discounting a medical source opinion takes on added significance in a case involving a severe mental impairment in that the Third Circuit has advised that "[t]he principle that an ALJ should not substitute his lay opinion for the medical opinion of experts is especially profound in a case involving mental disability."  *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000). In the case of mental health impairments, it is recognized that a medical source's opinion which relies on subjective complaints should not necessarily be undermined because psychological and

psychiatric conditions are necessarily and largely diagnosed on the basis of a patient's subjective complaints. *Hall v. Astrue*, 882 F. Supp. 2d 732, 740 (D. Del. 2012) (citing *Morris v. Barnhart*, 78 F. App'x 820, 825 (3d Cir. 2003)). Importantly, for a claimant like Plaintiff who has a mental impairment like "an affective or personality disorder marked by anxiety, the work environment is completely different from home or a mental health clinic." *Morales*, 225 F.3d at 319 (The treating physician's "opinion that [the claimant's] ability is seriously impaired or nonexistent in every area related to work shall not be supplanted by an inference gleaned from treatment records reporting on the claimant in an environment absent of the stress that accompany the work setting.")

ALJ Tranguch set out the following analysis of Dr. Berger's opinions: "The undersigned Administrative Law Judge gives limited weight to Dr. Berger's opinions of marked and extreme limitations and his opinion that she can only work part-time because the opinions are not supported by the evidence when considered in its entirety (Exhibits B9F & B12F)." (R. 30.) With citation only to Dr. Berger's opinions, the ALJ identifies no specific contradictory evidence or acknowledges evidence which supports the opinions. (*See* R. 30.) The discussion preceding his assessment of Dr. Berger's opinions does not show what evidence ALJ Tranguch found unsupportive. (*See* R. 28-29.)

As the record review set out above shows, the evidence

32

considered in its entirety does not necessarily lead to the conclusion that Plaintiff does not have marked and extreme limitations in a work setting when that setting involves "work-related activities on a day-to-day basis in a regular work setting,"--the setting in which Dr. Berger was directed to assess Plaintiff's abilities. (R. 462.) Dr. Berger's assessment that Plaintiff was able to work on a limited basis (*see*, *e.g.*, R. 478) does not fail to support or contradict his conclusion that her work-related abilities would be marked or extremely affected if she were to work full time. Given the facts of this case, including Plaintiff's bipolar disorder diagnosis and consistency of reported symptoms, particular attention must be paid to the discrepancy between the work and clinical environments as well as the validity of reliance on subjective complaints. *See Morales*, 225 F.3d at 319; *Morris*, 78 F. App'x at 825.

Considered in the context relevant to psychiatric disorders such as Plaintiff's bipolar disorder, particularly *Morales* caution about an ALJ's substituting his lay opinion for that of a treating professional, 225 F.3d at 319, the ALJ's assessment of Dr. Berger's opinions is woefully inadequate. Because ALJ Tranguch's assessment is not consistent with requirements set out by regulations and the Third Circuit Court of Appeals, this case is properly remanded for further consideration of the opinions.

## V. Conclusion

For the reasons discussed above, Plaintiff's appeal is properly granted and this matter is remanded to the Acting Commissioner for further consideration. An appropriate Order is filed simultaneously with this Memorandum.


                                   S/Richard P. Conaboy
                                   RICHARD P. CONABOY
                                   United States District Judge

DATED: October 19, 2017